Case number 20-2346, Southern Iowa, Patrick Kearns, et al. v. United States. Your Honor, this is David Faith appearing for the government. I believe I'm second. And Glenn Johnson, Your Honor, for the appellants. All right. You're both on my screen. So, Mr. Johnson, I think you're up first. Thank you very much, Your Honor. Your Honors, my name is Glenn Johnson. I'm with the firm of McKee, Voorhees & Cease in Iowa. I represent the appellants Pat Kearns and Jeff Detborn. The nature of this appeal focuses upon whether David Rideout was acting within the scope of his employment as a federal employee at the VA hospital. Counsel, let me ask, in terms of representation, is the union paying your fees and expenses to prosecute this appeal? They are not, Your Honor. Thank you. Thank you. The players in this appeal are David Rideout, a radiologist, Patrick Kearns, a registered nurse, and the president of the American Federation of Government Employees, Local 2547, and Jeff Detborn, a CT technologist and a member of Local 2547. The VA hospital in Iowa City established boundaries of medical practice for CT technologists. That is generally referred to as authorization of practice. It is conceptually the same as the hospital granting a physician medical privileges within the hospital, which privileges may be restricted or limited beyond which the physician may not perform or engage in a medical procedure. An example of this would be the hospital granting privileges to a general practice physician but not extending that grant to childbirth care. The beginning of this dispute involving the parties related to the imaging protocols of the VA hospital in Iowa City. The imaging protocols involve the specific manner in which a patient was positioned at the time the CT imaging scans were obtained. CT imaging scans are a non-invasive diagnostic tool for the treating physicians, which provide information about the physical condition of the internal body parts subject to the focus of the imaging study. The VA hospital in Iowa City created a set of imaging protocols based upon its view of what would yield the most effective diagnostic results from the various CT imaging studies. In other words, what was the best approach for the interest of the patients. The authorization to practice within the VA hospital is conferred upon the CT technologists mandated that they follow the protocols as established by the VA hospital. The exception, however, was that the radiologists could all alter these protocols by giving imaging studies by entry of a written physician order so that such altered technique was made part of the patient's medical record. Jeff Deppern, another CT technologist, Mr. Nygaard, held concerns about whether they were operating outside of the authorization to practice granted to them by the VA hospital by following Dr. Rideout's verbal directions to employ a protocol differing from the hospital's established protocol in the absence of an entry in the patient's record by Dr. Rideout, which documented this deviation of procedure. On May 23, 2017, Mr. Deppern raised objection to Mr. Rideout's actions of verbally modifying established hospital imaging protocol and Dr. Rideout verbally waylaid Mr. Deppern. Thereafter, Dr. Rideout approached Mr. Deppern's supervisor, Mr. Amberg, asserting that Mr. Deppern failed to properly perform as a CT technologist. The supervisor then issued a disciplinary action to Mr. Deppern. Shortly thereafter, in June of 2017, Mr. Deppern took the discipline to the union as he believed he was doing what the VA hospital had directed and authorized as the proper protocol procedures. This is where Mr. Kearns, as the union president, became involved. On June 13, 2017, the union made inquiry of Mr. Deppern's supervisor as to the details surrounding the discipline. The supervisor, Mr. Amberg, responded and copied Dr. Rideout on the response. On June 14, Dr. Rideout injected himself into the review via email and copied hospital management, including personnel of the office of safety, of patient safety, and he made known his views of the union. And specifically, he stated that the union was, quote, asking for the policy review on position for a CT scan which only serves to obstruct clinical care. On June 21, 2017, after further communication with the supervisor, Mr. Amberg, Mr. Kearns directed the policy question to the hospital management, including Dr. Longo, the medical supervisor of Dr. Rideout. The body of this email is reflected on page three of medical record practices implicate patient safety issues. The policy question raised by Mr. Kearns was decided by the hospital management in the form of the veteran, the VA hospital's office of patient safety. The determination was that a verbal direction to deviate from established hospital imaging protocol in performing CT imaging studies was not an acceptable practice and that such deviation required the radiologists to enter a doctor's order, essentially accomplished by entering a notation in the patient's record. Dr. Rideout acknowledged in his subsequent emails that the office of patient safety had settled the pending policy question. Dr. Rideout was unhappy with the result. Contrary to the conclusion of the district court in this case, there was not an unanswered policy question. After learning of the VA hospital's decision on this protocol policy issue, Dr. Rideout embarked upon a campaign of castigation and of retaliation toward Mr. Kearns and Mr. Detbarn. Council, Iowa law governs and I think it's 10 factors. If you go down the 10 factors of Iowa law and you look at the very broad whistleblower policies here, don't you think this is all within the scope of what the doctor can do? We do not, your honor, and that is that while he does have the ability to follow the whistleblower, that is to make a complaint, it's not just the fact that he has that ability but it's how that is accomplished, number one. Number two is the 10 factors you're talking about I believe would be the restatement factors and Iowa, the Iowa case law authority does not in our judgment cite that as directly controlling but as a guide to the application of Iowa law. Iowa law rather, your honor, looks at three specific areas with regard to scope of employment. The first, you know, the first of those areas is the right of control. The second one is were the actions of concern necessary to accomplish the purpose of the actor's employment and the third of which is were the actions of concern intended for such purpose of the actor's employment. So your honors, there are two issues that I'm going to address here. The first is the issue of direct evidence and I'll do that very briefly. In the ruling of the court, the addendum page 23, the district court cited the absence of direct evidence in its scope of employment analysis. The court equated direct evidence with specific facts. Requiring direct evidence imposes a high evidentiary bar, one that is not called for in the scope of employment analysis which is decided on a preponderance of evidence basis. Well, counsel, your time is short. Tell me the facts that you think show what you want us to think. All right, your honor. Well, focusing on the intent issue, well, we think the right of control issue was determined. Uh-oh. Looks like he's frozen. Go tell Tammy I'm frozen. You're not, your honor. Oh, good. It is past the time. I think we may have you coming up now. Okay. Can people hear me? Thank you very much. I apologize, your honors. I believe that the question was, you know, what are the facts of most import that we would highlight to the court? And there are two particular facts that I think are particularly critical in which show the intent of Dr. Rideout was not focused on patient safety or the best interest of the patient. The first of those actions involved Dr. Rideout's challenge to Mr. Detbarn's competency as a certified CT technologist. In mid-July 2017, after the Office of Patient Safety had resolved the policy issue on imaging protocols and Dr. Rideout was fully aware of that resolution, he filed a charge against Mr. Detbarn with the American Registry of Radiology Technologists. The record shows that sometime after having made this filing, Dr. Rideout acknowledged that he had submitted this charge, number one. And number two, he further acknowledged that he had done it to create difficulty for Mr. Detbarn, not due to the interests of the patient. The second part of the record that we would highlight for your honors relates to actions involving an imaging study of a patient that was conducted in mid-July 2017. Again, this was after the policy question had been resolved by the Office of Patient Safety and Dr. Rideout was aware of that resolution. In this particular activity, the imaging study that was performed was one that was sent to a group of outside radiologists for evaluation. The concept of sending out studies is called pushing them or pushing out studies. This particular study was not pushed out. And the day after the study was performed, Dr. Rideout made a status check in the computer system of the VA hospital as to this patient record. And in making that status check, Dr. Rideout observed that the study had not been pushed out. It had not been sent out to the third-party radiology group for analysis. Now, part of this is Dr. Rideout named Mr. Detbarn in the patient's medical record for failing to send out the patient study, an act that was unprecedented. Further, the hospital management, medical management of the VA hospital called out Dr. Rideout for this action of naming Mr. Detbarn in the patient record and told him to remove Mr. Detbarn's name. More significantly, however, appellants assert that the critical aspect of this event was that Dr. Rideout, recognizing the study had not been sent out for analysis, did not send the study out. He closed the file and did nothing. He allowed the study to remain unreviewed, unanalyzed. And then after it eventually was analyzed, approximately a week later, he verbalized and made a record entry in the patient's record that there was a significant delay in the analysis of this imaging study to the disinterest of the patient, and he blamed Mr. Detbarn for that. So those are the two key facts. Your Honors, I was trying to reserve some time, and I would like to reserve the remainder unless there's other questions at this stage. Mr. Faith, go ahead. Thank you, Your Honor. May it please the courts, the question before you boils down to this. Is it in the scope of a VA physician's employment to raise any concerns he has about the health care veterans are receiving, both internally and with outside oversight bodies? As the district court correctly found, the answer is yes. And this isn't only because of the self-evident public policy interests at play, but because VA policy explicitly says so. As it says in the Appendix 345-346, which lays out the whistleblower policy, anyone who reasonably believes that the law or any applicable professional or clinical standards are being violated, or that care services or conditions provided potentially endangers one or more patients, may, in addition to reporting to VA channels, disclose that information to, quote, any public health authority, and it explicitly states including state licensing boards, or health care accreditation organizations, or congressional committees and subcommittees having oversight of the VA. I think the then Stanley Parker, effectively Dr. Rideout's boss, put it even more clearly on page 353 of the Appendix. He said, quote, the VA has whistleblower protection, so anyone is allowed to file a complaint with any legal authority. Counsel, let me interrupt you. The Iowa test does have intent as the last factor, as you may know. Tell me if I need to add more, but just take it from me. It's can we determine intent without some kind of a hearing as to the basic facts? The district court had no hearing here, right? And can we determine intent? Because I think that's what the other side's trying to say. Understood, Your Honor. Well, there's a couple of components of that. One, I think if you look at Iowa case law, i.e. the Goddard case in 1999, it's pretty clear that the various interpretive tools they use, including the necessary and intended, including the restatement factors, including right of control, normal risks, all of that are just tools. But the question is always, is it authorized, or is it of the same general nature as incidental to what's authorized? Which is consistent with this court's ruling in Hewton v. Anderson, that it's only if conduct is in excess of the powers actually conferred on the servant that it's necessary to get into the intent and necessary analysis. Now, maybe I'm not understanding you, but our Hewton case and the Iowa cases all say it's necessary to accomplish the purposes and intended for such purpose. They repeatedly, we all repeat, all the relevant courts repeatedly say that. So do focus on intent. You know the statements they make about the intent here. I don't have to tell you that. Go ahead. Sure. And I will address that, Your Honor. I just wanted to make a distinction that in Hewton it says conducts in excess of powers conferred on servant is still within scope if necessary and intended to accomplish the employer. So it's if it's in excess that we get to that necessary and intent. But I'll get to the intent question. And here to answer your No, I don't think a hearing is necessary. The appellants were given the opportunity for one-sided discovery in this matter. In addition to documentary discovery, they were able to take depositions of witnesses, including Dr. Rideout, and were able to test Dr. Rideout's record of Dr. Rideout's testimony. And the district court considered that. The district court considered the appellate's claims that there were some inconsistencies in Dr. Rideout's statements and found them to be unpersuasive. And moreover, found them to be tangential to the issue of intent. That they didn't have anything to do with whether he was motivated by safeguarding his patients. All of the evidence actually in the record, including both Dr. Rideout's contemporary statements in the emails, and then his subsequent statements in his declarations, are all consistent that his concern was the well-being of his his patients. And that's why he was bringing up. And there frankly isn't anything short of speculation to oppose that. Counsel, let me interrupt you. The July 9, 2019, I think your client even later acknowledges, has a misstatement in it. And so, is it the district court here really judging credibility without having an evidentiary hearing? Well, your honor, I think the court is judging whether the appellants have met their burden of coming forward with evidence that suggests that Dr. Rideout was not motivated by patient welfare concerns. Because it is their burden. And unless they've met that burden of coming forth with evidence that sort of puts it seriously in question, it's not necessarily necessary to have someone sitting in the courtroom answering questions. Because that's really the only distinction here. He's already answered questions. It's in the record. The only difference would be having him in the courtroom and looking at his face. And I think in the absence of some contradiction having to do specifically with intent, something to suggest that he doesn't actually care about his patients. Without any evidence like that in the record, there's no reason to have a court hearing. What about the facts that were cited in the appellant's argument? Could you remind me, your honor, which specific facts you're referring to? Well, let's see. Mr. Johnson talked about an action that was taken solely to make problems for DetBarn. And then he talked about the imaging study that was sent to the outside group. And the notation in the patient record that DetBarn was responsible for the failure to send it out, as I recall. Weren't you listening to that? Yes, your honor. I guess my confusion was I don't really see that as relevant to the question of his concern about patient welfare. Well, that's what I want you to address, is whether those two facts do indeed support. Yes, your honor. And my answer to you is that no, it doesn't. The fact that he was raising concerns regarding specific actions of this radiological technologist and and raising it with those he thought were in a position to do something about it is consistent with the notion that he actually was concerned, that he thought it was a patient safety problem and was shouting to anyone who would listen about it. As to the allegation that he was doing it just to cause problems for them, I don't believe there's actually anything in the record to support that. I'm aware that I believe in one of the plaintiff's declarations they made that claim, which was denied, but there's nothing in any of the emails, any of the documents from the time that supports that he actually said that. Yeah. Counselor, let me ask a question. I know the focus here is on the whistleblower policy, but a rather broader issue occurs to me. To your knowledge, are there FTCA cases raising the question whether actions taken that involve labor relations, which obviously can often include anger and bad talk and so forth, whether those are almost per se within the scope of the case? Yes, Your Honor. I think some of the case law in this case supports that proposition. Hewton v. Anderson is a good example where a supervisor, he posted a picture of subordinates as mama pigs and sucking piglets. The court found that even though this was clearly improper and because it was a supervisor commenting on a subordinate's performance, and that even if it's improperly done... I know that I had read Hewton. I'm talking about there was a question here about whether the union was invading radiologists, what should be radiologists prerogative? Right out obviously had an opinion on that and Kearns obviously had an opposite opinion. It didn't ever really get resolved, but it seems to me that back and forth in that context is on the part of both of them are acting within the scope of their employment from the broad employer context. I agree. Is there case law on that? Well, Your Honor, as far as cases in the record... Wait a minute. I'm talking about your research for this case. I'm not talking about what you cited. Okay. I haven't seen any focus on this. I'm just asking if you research by any chance research that or do I do that myself? I apologize, Your Honor. I did not specifically research that question. I understand. It's understandable in this context. But I completely agree with your underlying point there, which is that these interactions entirely took place within the employment context. These were VA employees talking to each other, disagreeing with each other about how to treat VA patients and the entire disagreements arose out of that. So even like plaintiff argues that Rideout made some statements that sound like he's angry or that were characterized as being harsh, but that shows he was personally motivated. But it's those feelings, if they're there, and I don't want to speculate, but if they're there, they arose out of his frustration and how patients were being treated. So to the extent he did have any heartburn about that, it was derivative of the employment relationship of the purpose of treating his patient and the disagreement over that. And I also want to note that per Sandman v. Hague in the 1967 Iowa Supreme Court case, a deviation from an employer's business or interest to pursue an employee's own business or interest must be substantial in nature to relieve the employer from liability. And I bring this up because I think the way plaintiff or poet presents it is kind of like if his motivation isn't pure as the driven snow, that it's not in the employer's interest. And I don't think that's consistent with Iowa case law. It's not consistent with what this court ruled in Lawson v. United States, holding that a SSA employee reporting job-related improprieties of an SSA ALJ were not acting exclusively in their own interest. So I think that's really the standard here, is have they shown that he was acting exclusively in his own interest, so exclusively out of personal pique and not at all out of genuine concern for his patients. Now, a palant might argue, well, Lawson was interpreting Arkansas law, but the framework in Arkansas is very similar to Iowa. It's intending to act for the employer's benefits in Arkansas. In Iowa, it's intending to accomplish the purpose. And I would submit to you that act for the employer's benefit and accomplish the purpose of employment are distinctions without a difference. So Lawson applies here, and the standard is really exclusively. Was he acting exclusively for his own interest? And that's simply not established by anything in the record, and I don't think seriously called into question in anything in the record. Finally, I just want to note the appellant spent some time kind of arguing the underlying board supposedly sided with my client. And my response to that is that it's irrelevant because the Federal Tort Claims Act applies regardless of whether or not the employee actually did anything wrong. By its very terms, it applies if the federal employee actually committed negligence or intentional misconduct. So even if they're right, that doesn't matter so long as the act that he took, the reporting, the whistleblowing is the kind of conduct that is authorized or incidental to what is authorized. And I think with that, unless any of your honors have further questions, I will call my statement to a close. Thank you, Counsel. Is there any other? There's rebuttal time for Mr. Johnson. Thank you very much, Your Honor. First of all, let me address, if I may, the issue of whether or not the radiology practice issue was resolved. Appellants submit that it was, in fact, resolved. It was resolved by the Office of Patient Safety. That resolution was known by Dr. Rideout before he embarked on a series of attacks as to Mr. Detbarn and Mr. Kearns. So the fact is that he didn't like the decision by the Office of Patient Safety, which is unfortunate, but that is the appropriate party within the VA hospital to make that decision. The second point I want to I would highlight on page three of Appellant's reply brief, the email of June 21, 2017 by Mr. Kearns to VA management, including Dr. Longo, which set forth the policy issue. In other words, the issue that related to the radiology's prerogative to practice. And that was the issue that was decided by the Office of Patient Safety. That was, in fact, Mr. Kearns' involvement in this matter. He had some exchanges, email exchanges, with Mr. Amberg, the supervisor of Mr. Detbarn. He had email exchanges with Dr. Rideout. Dr. Rideout telephoned him on one occasion. He raised the policy question, got an answer to the policy question, and then was subjected to the vitriol of Dr. Rideout and the attacks of Dr. Rideout. So, you know, that's a point I guess I particularly wanted to make. The third point I wanted to make has to do with the imaging study that was not sent out for third-party review. That is a window into the mind of Dr. Rideout, appellants would submit. He was made aware the day after the study was done that it had not been sent out for review and analysis. Thus, the patient was not getting the information back and the treating doctor was not getting the information back from that study. He did not send the study out. Knowing that it had not been sent out, he rather closed the file and let it lay for a week. And then once the study was done, he criticized Mr. Detbarn roundly for his failure and for the delay associated with Mr. Detbarn's failure. That fact alone shows the intent of Dr. Rideout was not focused on patient safety. I've expired my time. I thank you all for the opportunity to speak with you. Thank you, counsel. The case has been well briefed and the argument has been quite very helpful and we'll take it under advice.